EDWARD J. MCINTYRE [SBN 80402]
emcintyre@swsslaw.com
MICHAEL M. VASSEGHI [SBN 210737]
mvasseghi@swsslaw.com
SOLOMON WARD SEIDENWURM & SMITH, LLP
401 B Street, Suite 1200
San Diego, California 92101
Telephone: (619) 231-0303
Facsimile: (619) 231-4755

Attorneys for SOLOMON WARD
SEIDENWURM & SMITH, LLP

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC LAW CENTER, A Professional Corporation and SOLOMON WARD SEIDENWURM & SMITH, LLP., <br><br> Plaintiff, <br><br> v. <br><br> SHAHROKH SAADAT-NEJAD, <br><br> Defendant. | CASE NO. 07-CV-00460 JLS (POR) <br><br> **SOLOMON WARD'S BRIEF ADDRESSING ISSUES THIS COURT'S ORDER RAISED DIRECTING PARTIES TO SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD NOT BE ENTERED** <br><br> Date:　　　To Be Determined <br> Time:　　　To Be Determined <br> Courtroom: 6 <br><br> Hon. Janis L. Sammartino |

**TABLE OF CONTENTS**

PAGE(S)

I    INTRODUCTION ..................................................................................................1

II   PROCEDURAL BACKGROUND ..........................................................................1

III  FACTUAL BACKGROUND ...................................................................................2

     Solomon Ward. ....................................................................................................2

     Saadat-Nejad Retained, then Fired Pacific Law Center.................................2

     Saadat-Nejad Misappropriates Pacific Law Center's Domain Name. ..........3

     Then Saadat-Nejad Misappropriated Solomon Ward's Domain Names......................4

     Evidence of Saadat-Nejad's Misappropriation.................................................5

IV   PREVIOUS FINDINGS OF THIS COURT ..........................................................5

     The Findings. .......................................................................................................6

     The Preliminary Injunction. ...............................................................................7

V    SAADAT-NEJAD SHOULD BE PERMANENTLY ENJOINED FROM
     REGISTERING AND MAINTAINING WEB SITES WITH "SOLOMON WARD"
     IN THE DOMAIN NAME.......................................................................................8

     Prior Demands for Money. ................................................................................12

     *Quid Pro Quo* Ransom in Disguise..................................................................12

     A Demand For Money Is Not Necessary for an ACPA Violation. ..............13

     No Commercial Use Requirement. ..................................................................14

     Saadat-Nejad Registered Multiple Web Sites. ..............................................15

     A Permanent Injunction Will Not Infringe On Saadat-Nejad's First Amendment
     Rights....................................................................................................................16

VI   JUDGE BURNS' FINDINGS SHOULD STAND ...............................................17

VII  CONCLUSION ...................................................................................................18

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bosley Medical Institute Inc. v. Kremer,*
    403 F.3d 672 (9th Cir. 2005)......................................................................... 14

*Castner v. First National Bank of Anchorage,*
    278 F.2d 376 (9th Cir. 1960)......................................................................... 17

*Fairbank v. Wunderman Cato Johnson,*
    212 F.3d 528 (9th Cir. 2000)......................................................................... 17

*In re: Genesisintermedia, Inc. Securities Lit.,*
    2007 U.S. Dist. LEXIS 95243 (C.D. Cal. 2007) ........................................... 17

*Lamparello v. Falwell,*
    420 F.3d 309 (4th Cir. 2005)......................................................................... 15

*Lucas Nursery and Landscaping, Inc. v. Grosse,*
    359 F.3d 806 (6th Cir. 2004)................................................................... passim

*Sporty's Farm, LLC v. Sportman's Market, Inc.,*
    202 F.3d 489 (2nd Cir. 2000) ....................................................................... 10

*The Christensen Firm v. Chameleon Data Corp.,*
    2006 U.S. Dist. LEXIS 79710 (Wash. 2006) ............................................... 14

*The Toronto Dominion Bank v. Karpachev,*
    188 F.Supp.2d 110 (Mass. 2002) ........................................................... 13, 14

*TMI Inc. v. Maxwell,*
    368 F.3d 433 (5th Cir. 2004)................................................................... 10, 11

**STATUTES**

15 U.S.C., § 1125(d) ............................................................................................ 7

SOLOMON WARD SEIDENWURM & SMITH respectfully submits the following brief in response to this Court's June 16, 2008 Order.

# I
# INTRODUCTION

No good deed goes unpunished. Solomon Ward did what it does best—it represented a client in a lawsuit. In retaliation, Saadat-Nejad turned on Solomon Ward, appropriated, with miniscule and confusingly similar variation, Solomon Ward's domain names and launched web sites attacking the firm. His web sites accuse Solomon Ward attorneys, among other things, of sponsoring terrorism, and engaging in international child sex slavery. These are not "gripe sites"—sites registered by disgruntled customers to complain about a bad experience with an entity that provided them with poor product or service. Saadat-Nejad was never a client of Solomon Ward, and has no basis to gripe about the firm.

Because Saadat-Nejad's web sites violated the Anti-Cybersquatting Protection Act, this Court granted Solomon Ward a temporary restraining order and then a preliminary injunction; both barred Saadat-Nejad from misappropriating Solomon Ward's domain names—or ones so close that it was difference without distinction. The subsequent contempt proceedings demonstrate that, if given the opportunity, Saadat-Nejad will resurrect those web sites. Solomon Ward requests that this Court make its preliminary injunction permanent in order to prevent Saadat-Nejad from doing just that.

# II
# PROCEDURAL BACKGROUND

On June 12, 2008, this Court heard Solomon Ward's motion to make this Court's preliminary injunction permanent. *Sua sponte*, the Court entered an order to show cause why summary judgment should not be granted and requested the parties brief three issues: 1) what constitutes bad faith intent to profit as required under Anti-Cybersquatting Protection Act; 2) what is the legality of "gripe sites;" 3) if defendant did posses bad faith intent; but no longer does, can the Court still permanently enjoin him from creating gripe sites that

incorporate the words "Solomon Ward" and "Pacific Law Center."[1]  An analysis of the first

inquiry, necessarily answers the second and third questions.

### III
### FACTUAL BACKGROUND

**Solomon Ward.**

Solomon Ward has been for 30 years, known and practicing law throughout

California and across the country.[2]  Solomon Ward has used the exclusive service marks

and trade names "Solomon Ward Seidenwurm & Smith" and "Solomon Ward" in its

professional business.  Solomon Ward has registered the internet domain names

"swsslaw.com" and "solomonward.com" and has operated internet sites at swsslaw.com to

make the public aware of its professional practice.[3]

Solomon Ward has over the years built up valuable goodwill in its service marks and

trade names and the general public has come to associate those names exclusively with

Solomon Ward's professional practice in San Diego, throughout California and across the

nation.[4]

**Saadat-Nejad Retained, then Fired Pacific Law Center.**

On August 31, 2006, Saadat-Nejad retained Pacific Law Center to defend him against

criminal charges pending in San Diego and for which he was then incarcerated.  Shortly

thereafter, Saadat-Nejad became dissatisfied with Pacific Law Center's representation,

terminated its representation of him and began a course of conduct, including posting

disparaging comments about Pacific Law Center on the internet calculated to interfere with

and damage it and its business operations.[5]

---

[1]  *See* Order: Directing Parties To Show Cause As to Why Summary Judgment Should Not
Be Entered. Dated July 16, 2008. (Docket No. 78)
[2]  Declaration of Edward J. McIntyre ("McIntyre Decl.") in Support of Solomon Ward's
Application for TRO at ¶ 14. (Docket No.55)
[3]  *Id.* at ¶ 15.
[4]  *Id.* at ¶ 16.
[5]  *Id.* at ¶ 8.

**Saadat-Nejad Misappropriates Pacific Law Center's Domain Name.**

On September 20, 2006, Saadat-Nejad registered and obtained ownership of the internet domain name "pacificlawcenters.com," which is confusingly similar to the internet domain names registered to Pacific Law Center and sites it uses.[6]

He maintained registration of the internet domain name of, and operated the internet site at, "pacificlawcenters.com" with the intent of (1) intercepting actual and potential clients of Pacific Law Center and the general public who use internet search engines "key word" search features which would otherwise lead them to Pacific Law Center's internet site(s), (2) intercepting consumers who have added the letter "s" to Pacific Law Center's true internet site name(s) in attempting to find plaintiffs internet site; and (3) once consumers enter Saadat-Nejad's internet site, exposing them to its content, which is intended and designed to disparage and harm the goodwill of Pacific Law Center, attempt to dissuade actual and potential clients from doing business with Pacific Law Center and to entice them to communicate by email with Saadat-Nejad and to visit another internet site which is owned and operated by Saadat-Nejad under the internet domain name "ushostage.com."[7]

Saadat-Nejad has made clear that he will not stop using the Pacific Law Center mark and trade name. He further made clear that he intended to continue his vendetta against Pacific Law Center arising out of its representation of him in state court.[8]

Saadat-Nejad, through a lawyer purporting to represent him, told Pacific Law Center that unless it pays him $500,000 he will continue to use its domain name. Saadat-Nejad reiterated that threat at a meeting at Solomon Ward's office.[9]

Pacific Law Center knows that it has lost clients as a result of Saadat-Nejad's misappropriation of its trade name and its domain name.

On January 12, 2007, Pacific Law Center filed an action in superior court against

---

[6] *Id.* at ¶ 9.
[7] *Id.* at ¶ 10.
[8] *Id.* at ¶ 11.
[9] *Id.* at ¶ 12.

1  Saadat-Nejad, Case No. GIC 878352.  On February 23, 2007, Pacific Law Center retained

2  Solomon Ward to represent it in that lawsuit.  On February 27, 2007, Solomon Ward

3  successfully obtained a restraining order against Saadat-Nejad.

4  **Then Saadat-Nejad Misappropriated Solomon Ward's Domain Names.**

5       Saadat-Nejad has obtained at least two a confusingly similar domain names

6  "solomonwardlawfirm.com" and "solomonwardsandiego.com."[10]

7       Saadat-Nejad maintained registration of these internet domain names and operated

8  these internet sites with the intent of (1) intercepting actual and potential clients of Solomon

9  Ward and the general public who use internet search engines' "keyword" search features

10  which would otherwise lead them to Solomon Ward's internet sites; (2) intercepting clients

11  who have added "law firm" to Solomon Ward's true internet site name in an attempt to find

12  Solomon Ward; and (3) once clients enter Saadat-Nejad internet site, exposing them to its

13  conduct which is intended and designed to disparage and harm the goodwill of Solomon

14  Ward, attempting to dissuade actual and potential clients from doing business with Solomon

15  Ward and to entice them to communicate by email with Saadat-Nejad and to visit another

16  internet site which is owned and operated by Saadat-Nejad under the internet domain name

17  "ushostage.com."[11]

18       Saadat-Nejad has made clear that he will not stop using the Solomon Ward mark and

19  trade name.  He further made clear that he intended to continue his vendetta against

20  Solomon Ward because it represented Pacific Law Center in both the state and this action.[12]

21       Solomon Ward has already had inquiries about the pirate site that Saadat-Nejad has

22  used.[13]

23       At this point it is clear that Solomon Ward has already suffered irreparable harm as a

24  result of Saadat-Nejad's conduct and it will continue to suffer irreparable harm unless this

25

26  [10] *Id.* at ¶ 18.
27  [11] *Id.* at ¶ 10.
    [12] *Id.* at ¶ 11.
28  [13] *Id.* at ¶ 21.

Court stops him permanently.[14]  There is no way to accurately determine the whole of the harm that Saadat-Nejad has done to Solomon Ward and its reputation and the reputation of its attorneys.  As a result, money damages are inadequate to repair that harm.  In that respect, Solomon Ward has already suffered and will continue to suffer irreparable harm until this Court stops Saadat-Nejad for good.[15]

**Evidence of Saadat-Nejad's Misappropriation.**

This Court's record is already filled with evidence of Saadat-Nejad's misappropriation of Solomon Ward's service marks, trade names and domain names. Solomon Ward respectfully requests this Court to take judicial notice of its own files and direct the Court specifically to the exhibits already in the record.[16]

## IV
## PREVIOUS FINDINGS OF THIS COURT

This Court has granted Solomon Ward's motion for a temporary restraining order and, thereafter, a preliminary injunction.  At each hearing, the Court conducted a patient and extended colloquy with Saadat-Nejad informing him what he could and could not do.  As a result, Saadat-Nejad attacked Judge Burns personally, accusing him, among other lies, of being in Solomon Ward's pocket.[17]

The temporary restraining order, however, did not stop Saadat-Nejad; neither did the preliminary injunction.  Nor did this Court's colloquies that warned Saadat-Nejad not to "get

---

[14]  *Id.* at ¶ 22.
[15]  *Id.* at ¶ 22.
[16]  Those Exhibits and authenticating declarations are at McIntyre Declaration, with Exhibits (Docket No. 3); Slattery Declaration, with Exhibits (Docket No. 3); Phillips Declaration, with Exhibits (Docket No. 18); Supplemental Memorandum, with Exhibits (Docket No. 18); McIntyre Declaration (Docket No. 36); McIntyre Declaration (Docket No. 39); Exhibits in Notice of Lodgment, and specifically Exhibits 5 through 11 (Docket No. 39); McIntyre Declaration (Docket No. 48).
[17]  See, for example, Transcript of April 26, 2007 hearing, Exhibit 4, and specifically p. 4:35 (Docket No. 39); see also Exhibits 5.2 and 9.6 (Docket No. 39).  By way of further example, he claimed in his response to the preliminary injunction motion (Docket No. 24) that Solomon Ward has "judges in their back pockets," the same accusation that he leveled against Judge Burns.

1  chalk on his shoes," or he would go to jail.[18]  Accordingly, the Court found Saadat-Nejad in

2  contempt and incarcerated him for almost two weeks.[19]

3         On March 29, 2007, this Court entered a temporary restraining order that states:

4  Shahrokh Saadat-Nejad, and anyone acting in concert with him, is hereby
    enjoined and restrained from:

5

6  1.      Registering, and trafficking in, any internet web site or domain name
that contains the words Pacific, Law and Center, with or without other words
or symbols, in any respect whatsoever;

7

8  2.      Registering, and trafficking in, any internet web site or domain name
that contains the words Solomon and Ward, with or without other words or
symbols, in any respect whatsoever;

9

10  3.      Registering and trafficking in, the service mark or trade name Pacific
Law Center in any respect whatsoever.

11  4.      Registering and trafficking in the service mark or trade name Solomon
Ward or Solomon Ward Seidenwurm & Smith in any respect whatsoever.

12

13  **The Findings.**

14         In entering that order, this Court made the following findings of fact and law:

15  The standard for issuing a temporary restraining order is identical to the
standard for issuing a preliminary injunction.  A party seeking injunctive relief
16  under Rule 55 must show … [a strong likelihood] of probable success on the
merits and the possibility of irreparable harm or alternatively if serious
17  questions are raised and the balance of hardships tips sharply in the moving
party's favor.  These formulations represent two points on a sliding scale,
18  which the required degree of irreparable harm increases as the probability of
success decreases.  Even if the court is uncertain of the moving party's
19  likelihood of success on the merits, a TRO may still issue if the moving party
convinces the court that the balance of hardships tips in its favor.

20
Here I find that the plaintiffs have shown **both** a combination of probable
21  success on the merits and the possibility of irreparable harm and that serious
questions are raised and the balance of hardships tips sharply in the moving
22  party's favor.  The TRO in this case is supported by declarations of Mr.
McIntyre and Thomas Slate (phonetic), a supervising lawyer at pacific law
23  center.  Their declarations substantiate that Mr. **Saadat-Nejad intentionally
obtained and used confusing web sites to discredit and disparage the two
24  law firms** and to make what they allege are false and inflammatory
accusations about the law firms and their lawyers.  As a result, there has been
25  harm to their reputation and businesses.

26  _____

27  [18]  Transcript of April 26 hearing, 4:22-23 (Docket No. 39).
[19]  Contempt order, entered July 14, 2006 (Docket No. 43); July 12, 2007 minute order
28  (Docket No. 12).

The declarations also substantiate that each law firm has established a secondary meaning to their service marks and trademark names associated with their professional practices. Mr. Saadat-Nejad, in the court's opinion, having viewed both his evidence and that submitted by the plaintiffs, does not appear to have any legitimate trademark or common law or registered right to use any name even remotely similar to Pacific Law Center or Solomon Ward and specifically no right to use pacificlawcenters.com and pacific/law/centers.com or solomonwardlawfirm.com or solomonwardsandiego.com.

I find in agreement with the plaintiffs that there's a great likelihood of harm if this conduct persists to their reputation. As I said, I've found that they've established, both law firms, a secondary meaning to these marks and the names associated with their professional practices.

The court has examined the underlying law in this case, the 1999 Anti-Cybersquatting and Consumer Protection Act, codified at Title 15 of the United States Code, Section 1125(d). The purpose of that section is to protect consumers and American businesses and to promote growth of online commerce, provide clarity for trademark owners by prohibiting bad faith and abusive registration of distinctive marks as internet domain names with the intent to profit from the goodwill associated with those marks.

In addition, the 9th Circuit has held that the Anti-Cybersquatting Act does not contain a commercial use requirement so that although they probably can in this case, the plaintiffs don't need to show actual commercial interference with their law practices from Mr. Saadat-Nejad's domain name misappropriation in order to prevail.[20]

## The Preliminary Injunction.

On April 26, 2007, this Court entered a preliminary injunction that repeated verbatim the Court's prior temporary restraining order.

In entering that preliminary injunction, this Court found:

The Court incorporates the transcript of proceedings at the temporary restraining order. I understand that it has not yet been prepared, but I incorporate that into my finding and analysis today. The legal standards discussed at that hearing and in the order that followed it apply here as well.

The Court confirms its findings from the earlier hearing. I find that a preliminary injunction should issue. I find both a combination of probable success on the merits on the part of the plaintiffs and the possibility of irreparable harm of the kind that would issue has not ceased subject to a court order. The balance of hardships tips sharply in favor of the moving party.[21]

---

[20]  Transcript of March 29, 2007 hearing, pp. 2:15-2:18 (Docket No. 39). [Emphasis added.]
[21]  Transcript of April 26, 2007 hearing, 4:12-13 (Docket No. 39).

# V
## SAADAT-NEJAD SHOULD BE PERMANENTLY ENJOINED FROM REGISTERING AND MAINTAINING WEB SITES WITH "SOLOMON WARD" IN THE DOMAIN NAME

The Anti-Cybersquatting Protection Act ("ACPA") lists nine non-exclusive factors for courts to consider in deciding whether a defendant has a bad faith intent to profit from use of a mark. Analyzing these factors leads to the inescapable conclusion that this Court should afford Solomon Ward the intended protection of the ACPA. It analyzes each of these nine factors in turn.

**(1) the trademark or other intellectual property rights of the person, if any, in the domain name;**

Solomon Ward is a San Diego based firm, established in 1977. The firm has used the exclusive service marks and trade names "Solomon Ward Seidenwurm & Smith" and "Solomon Ward" in its professional business. The firm has registered the internet domain names "swsslaw.com" and "solomonward.com" and has operated sites at "swsslaw.com" to make the public aware of its professional practice. Solomon Ward has more than thirty years of established right to use its own name as its domain name.

Saadat-Nejad registered **multiple** sites with domain names that contain the name, "Solomon Ward."

**(2) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;**

"Solomon Ward" is Solomon Ward's name; it does not constitute any part of Saadat-Nejad's legal name, nor is he referred to by any of those names.

**(3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;**

Saadat-Nejad's web sites were designed for the sole purpose of attacking and disparaging Solomon Ward. Saadat-Nejad's web sites offered no goods or services, of any kind.

///

///

**(4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;**

### Saadat-Nejad's Web Sites Are Not Legitimate Gripe Sites And Therefore Not "Bona Fide."

Cases dealing with the ACPA look to the intent of the web site creator to determine whether the use of the site is "bona fide" or constitutes "fair use." In *Lucas Nursery* [22] defendant registered the domain name www.lucasnursery.com to post her dissatisfaction with a landscaping company she had actually used, and included complaints regarding its poor preparation of the soil before laying sod. The court held that there was no ACPA violation because her actions did not amount to "bad faith intent to profit." The court, however, qualified its reasoning: "[p]erhaps **most important** to our conclusion are, [defendant's] actions, which seem to have been undertaken in the **spirit of informing fellow consumers** about the practices of a landscaping company that she believed had performed inferior work on her yard."[23]

The ***critical distinction*** between Saadat-Nejad's web sites and the single site registered by defendant in *Lucas Nursery* is that the *Lucas Nursery* defendant was a customer of the entity she registered a gripe site against. Had she not been a customer, she would have had no basis to "gripe." Whether she actually obtained poor services from the nursery is irrelevant. What was important was the she contracted for Lucas Nursery's services, used their services, paid them, and was ultimately unhappy with the service they provided her. He connection with Lucas Nursery provided a "bona fide," "fair use" reason for registering a gripe site.

Saadat-Nejad was never a client of Solomon Ward. Solomon Ward never provided any services to Saadat-Nejad, and therefore he has no reason to have a gripe about any professional services Solomon Ward rendered to him. The only reason Solomon Ward came into Saadat-Nejad's scope was because it successfully represented its client, Pacific Law

---

[22] *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004) (emphasis added).
[23] *Id.* at 811.

1  Center.

2  **Saadat-Nejad's Web Sites Provide No Valuable Information, and Do Not Constitute "Fair**
   **Use."**
3

4      The content of the gripe site registered by the *Lucas Nursery* defendant was

5  informative, and used as a platform to publish what the customer perceived as a legitimate

6  complaint about plaintiff's services.  The gripe site provided at least two legitimate, "fair use"

7  purposes:1) to warn would-be customers that the nursery might provide them with sub-par

8  service; and 2) to induce the nursery to improve its level of service to avoid the

9  embarrassment of such criticism in the future.

10     Saadat-Nejad's web sites have no such informative or "fair use" qualities.  The

11  content of Saadat-Nejad's web sites are filled with baseless accusations, such as allegations

12  that Solomon Ward attorneys represent child abusers and child molesters, and that they

13  engage in international child sex slavery.[24]  No legitimate purpose exists for these web sites,

14  and are void of any "gripe."  They do not warn potential Solomon Ward clients about any

15  deficiencies in the firm's services.  Indeed they cannot since Saadat-Nejad has no basis for

16  such a "gripe" because he was never a client.

17     Nor do the sites motivate Solomon Ward to improve anything about the firm.  That is

18  because Saadat-Nejad's web sites either criticize Solomon Ward for things it cannot change

19  (that many attorneys at the firm have certain religious affiliations), or that are simply not true,

20  (that Solomon Ward attorney's engage in international child sex slavery or that they support

21  certain terrorist organizations).  The unique circumstances of each case should be

22  considered in each case which do not fit neatly into the specific factors enumerated by

23  Congress.[25]  The unique circumstances and reality of this case is that Saadat-Nejad has no

24  basis for any gripe again Solomon Ward.

25

26

27  [24]  http://solomonwardlawfirm.com (3/12/2007)
    [25]  *See Sporty's Farm, LLC v. Sportman's Market, Inc.*, 202 F.3d 489, 499 (2nd Cir. 2000).
28

1    *TMI Inc.*,[26] another case cited in this Court's July 16, 2008 Order also discusses the

2    intent behind gripe web sites.  As in *Lucas Nursery*, *TMI Inc.* also involved a gripe site by a

3    dissatisfied customer, unhappy with misrepresentations the homebuilder TMI, Inc. made.

4    Like the defendant in *Lucas Nursery*, the defendant in *TMI Inc.* registered a single site for the

5    purpose of publicizing his dispute with plaintiff.

6            That court said:

7            ***Perhaps most important to our conclusion are, [defendant's] actions, which
         seem to have been undertaken in the spirit of informing fellow consumers***

8            ***about the practices of a landscaping company that she believed had
         performed inferior work on her yard.***  One of the ACPA's main objectives is

9            the protection of consumers from slick internet peddlers who trade on the
         names and reputations of established brands. **The practice of informing fellow**

10           **consumers of one's experience with a particular service provider is surely
         not inconsistent with this ideal.**[27]

11

12           Saadat-Nejad's web sites simply attack Solomon Ward and are devoid of the "spirit of

13   informing fellow consumers" about Solomon Ward.  His web sites differ materially from the

14   web sites at issue in *Lucas Nursery* and *TMI Inc.*—where defendants' web sites were

15   registered with at least a facial appearance of consumer protection or consumer information.

16   **(5) the person's intent to divert consumers from the mark owner's online location to a site
     accessible under the domain name that could harm the goodwill represented by the mark,**

17   **either for commercial gain or with the intent to tarnish or disparage the mark, by creating
     a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the**

18   **site;**

19           Several factors support Saadat-Nejad's intent to divert customers from Solomon

20   Ward's web site to one of his own.  First, the fact that the domain names are designed so

21   that anyone performing a "keyword" search for Solomon Ward's legitimate web site gets

22   Saadat-Nejad's web sites as an option.

23           Once the person is re-directed to his web sites, he provides the following

24   admonition: "WARNING: DO NOT HIRE."  It is obvious that he intends this to be read by

25   potential or current Solomon Ward clients.  His "intent to divert" is also apparent because he

26   _____

27   [26]  *TMI Inc. v. Maxwell*, 368 F.3d 433 (5th Cir. 2004).
     [27]  *TMI Inc.* at 440 (emphasis added).

28

1 | could have aired his gripe in a variety of alternative ways, including posting commentary on

2 | blogs or web sites specifically designed for dissatisfied customers to share their negative

3 | experiences with others.[28]

4 |       The second prong of this factor—intent to disparage mark—is clear.  Saadat-Nejad's

5 | web sites are designed for the **sole** purpose of discrediting Solomon Ward and its attorneys—

6 | by claiming that they are associated with terrorists organizations; suggesting that they act in

7 | concert with federal judges to obtain favorable treatment for clients; and that they engage in

8 | international child sex slavery.

9 | **(6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark**
   | **owner or any third party for financial gain without having used, or having an intent to use,**
10 | **the domain name in the bona fide offering of any goods or services, or the person's prior**
   | **conduct indicating a pattern of such conduct;**
11 |

12 | **Prior Demands for Money.**

13 |       In February 2007 Saadat-Nejad's lawyer sent a demand letter to defendant Pacific

14 | Law Center requesting $500,000.  Saadat-Nejad also requested that he should be paid

15 | "millions" during the March 17, 2008 conference before Magistrate Judge Porter.[29]

16 | ***Quid Pro Quo* Ransom in Disguise.**

17 |       On  July 1, 2008, a Solomon Ward attorney, Michael Vasseghi, called Saadat-Nejad

18 | to see if he would stipulate to a permanent injunction and eliminate the time and expense of

19 | the parties to prepare, and the court to review, these papers.  Mr. McIntyre, the partner

20 | overseeing this case, suggested to Mr. Vasseghi that Mr. Vasseghi might be able to reason

21 | with Saadat-Nejad since Saadat-Nejad's apparent animosity towards Mr. McIntyre as the

22 | attorney of record might be impeding his efforts towards a possible resolution.  Mr.

23 | Vasseghi, who happens to speak Farsi—Saadat-Nejad's native language—left a message for

24 | Saadat-Nejad in Farsi, and requested a return call.  Saadat-Nejad called back and Mr.

25 | Vasseghi invited him to come to Solomon Ward's office to discuss the case (even though on

26 |

27 | [28] *See* e.g. The Rip Off Report
   | http://www.ripoffreport.com/reports/0/285/RipOff0285151.htm.

28 | [29] McIntyre Decl. ¶ 2 (filed concurrently herewith).

1  one trip to the office, he brought a baseball bat with him).  He refused.[30]

2       During this phone conversation, Saadat-Nejad said that he would enter into a

3  stipulation for permanent injunction, but he made his demand for money from Solomon

4  Ward clear and certain.  He wanted to be compensated for the "harms" Solomon Ward had

5  caused him, including causing him to go to jail and filing falsified documents.[31]

6       When asked how much money he thought he was entitled to receive, Saadat-Nejad

7  stated that the amount was for "you [Solomon Ward] to figure out."[32]  Asking for money—

8  regardless of how one labels the demand—is further evidence that Saadat-Nejad demands

9  compensation as a precondition to agreeing to a permanent injunction that would bar him

10  from using web sites with Solomon Ward's name in their domain names.

11  **A Demand For Money Is Not Necessary for an ACPA Violation.**

12       Even if Saadat-Nejad had truly abandoned his idea of holding Solomon Ward's web

13  sites for ransom, that alone, does not overcome an ACPA violation.

14       In *The Toronto Dominion Bank*[33] ("*TDB*"), Boris Karpachev, a disgruntled customer of

15  TD Waterhouse, registered several domain names composed of variant misspellings of the

16  name tdwaterhouse.com.[34]  On the internet sites associated with these domain names,

17  Karpachev accused TD Waterhouse of "webfascism" and Toronto-Dominion Bank for its

18  involvement in "white collar crime."[35]  Toronto Dominion Bank moved for summary

19  judgment on its claims for trademark infringement and unfair competition under the ACPA.

20       There was no dispute that plaintiff had a preexisting distinctive and famous mark and

21  that the domain names that Karpachev registered were identical or confusingly similar. The

22  court looked to whether Karpachev had acted in bad faith with intent to profit from plaintiff's

23

24  [30]  Declaration of Michael M. Vasseghi ¶ 2 (filed concurrently herewith).
    [31]  *Id.* at ¶ 3.  Saadat-Nejad, of course, went to jail for violating Judge Burns' order, not
25  because of anything that Solomon Ward did.  Similarly, Solomon Ward has never filed
    any falsified documents in this case.
26  [32]  *Id.* at ¶ 4.
    [33]  *The Toronto Dominion Bank v. Karpachev*, 188 F.Supp.2d 110 (Mass. 2002).
27  [34]  *Id.* at 113.
    [35]  *Id.* at 112.

28

mark, and found that he had "traversed" several of the nine factors, including the fact that 1) he intended to divert consumers from plaintiffs' mark; 2) he created multiple domain names; 3) the domain names that were created were not in connection with the offering of any goods or services; 4) he had no intellectual property rights to the names; and 5) he had acted with intent to tarnish or disparage TD Waterhouse's and Toronto Dominion Bank's marks.[36] Based on these findings, the Court granted plaintiff's motion for summary judgment on the ACPA claims.

**Saadat-Nejad has "traversed" every single ACPA factor Karpachev "traversed" in *TDB*, and more.** Notably, nothing in *TDB* suggests that Karpachev, **asked for any money** in exchange for the "release" of the domain names he had created. The lack of a demand for money did not preclude the *TDB* court from granting summary judgment that supported a finding of an ACPA violation.

## No Commercial Use Requirement.

Judge Burns has already established that there is no need for Solomon Ward to show commercial interference with its law practice to prevail under the ACPA[37] and this Court appears to concur with Judge Burns.[38] The Ninth Circuit has held that the ACPA does not contain a commercial use requirement.[39] In *The Christensen Firm*,[40] the law firm sued because the defendant had shifted the registration of the firm's domain names to itself to gain leverage in a payment dispute. Besides finding that defendant was not entitled to summary judgment on plaintiff's ACPA claims against him, despite the absence of a "commercial use," the case again highlights that gripe sites are sites by those with a pre-existing relationship with the party at issue—an attorney-client relationship in the case of *Christensen*.

---

[36] *Id.* at 114.
[37] Transcript of March 29, 2007 hearing, 4:17-28 (Docket No. 39).
[38] *See* Transcript of June 12, 2008 hearing, p.9 - Exhibit 9 to Notice of Lodgment.
[39] *Bosley Medical Institute Inc. v. Kremer*, 403 F.3d 672, 608 (9th Cir. 2005).
[40] *The Christensen Firm v. Chameleon Data Corp.*, 2006 U.S. Dist. LEXIS 79710 (Wash. 2006).

**Saadat-Nejad Registered Multiple Web Sites.**

In *Lucas Nursery*[41] the defendant registered only the domain name www.lucasnursery.com to post her complaints about landscaping company she had used, and included complaints about poor soil preparation. In that case the court held that there was no ACPA violation because her actions did not amount to "bad faith intent to profit." The *Lucas Nursery* court held that the sole distinction between the case before it and *TDB*— a case on which the *Lucas Nursery* plaintiff relied—was that in *TDB*, the defendant registered **multiple** web sites, not just one.[42] Saadat-Nejad has registered at least four separate domain names – two for Solomon Ward, and two for Pacific Law Center.

*Lamparello*,[43] another case the Court cited, is similarly distinguishable on this and other grounds. **First**, the *Lamparello* defendant only registered a **single** web site. Saadat-Nejad registered multiple sites. **Second**, at no point did the *Lamparello* defendant attempt to sell the site, or demand any money during the course of the litigation. Saadat-Nejad has not been so virtuous. **Third**, the *Lamparello* Court made a finding that there was no confusion between the site created by defendant and Fallwell's site. Here, this Court has already considered and ruled on this issue, finding that "Mr. Saadat-Nejad intentionally obtained and used **confusing** web sites to discredit and disparage the two law firms."[44] **Fourth**, "the primary motive of Lamparello's web site was to express opinions on issues that were contrary to those of Reverend Falwell, and not to take away monies or profit."[45] Here, Saadat-Nejad is not attempting to provide any legitimate views that oppose those of Solomon Ward. Furthermore, his intent is to prevent potential clients from using Solomon Ward's services as evidenced by his web sites' "WARNING: DO NOT HIRE" admonition. This is evidence of his intent to take away clients, and as a result, "monies or profit," from

---

[41] *Lucas Nursery and Landscaping, Inc. v. Grosse*, 359 F.3d 806 (6th Cir. 2004).
[42] *Id.* at 811.
[43] *Lamparello v. Falwell*, 420 F.3d 309 (4th Cir. 2005).
[44] Findings of Law and Fact by Judge Burns at March 29, 2007 hearing, pp. 2:15-2:18 (Docket No. 39).
[45] *Lamparello supra* at 312 (internal quotes and brackets omitted).

1  Solomon Ward.

2  **(7) the person's provision of material and misleading false contact information when**
   **applying for the registration of the domain name, the person's intentional failure to**
3  **maintain accurate contact information, or the person's prior conduct indicating a pattern**
   **of such conduct;**

4

5      Solomon Ward has no information whether Saadat-Nejad provided material and

6  misleading contact information when applying to register the domain names.

7  **(8) the person's registration or acquisition of multiple domain names which the person**
   **knows are identical or confusingly similar to marks of others that are distinctive at the**
8  **time of registration of such domain names, or dilutive of famous marks of others that are**
   **famous at the time of registration of such domain names, without regard to the goods or**
9  **services of the parties; and**

10      Saadat-Nejad registered multiple confusingly similar domain names to Solomon

11  Ward's legitimate web site.  Solomon Ward is aware of at least two such sites:

12  solomonwardlawfirm.com and solomonwardsandiego.com.

13  **(9) the extent to which the mark incorporated in the person's domain name registration is**
   **or is not distinctive and famous.**

14

15      Solomon Ward's name is distinctive and famous and has achieved secondary

16  meaning.  It has been in existence since 1977 and its name in the legal community is known

17  and well respected.

18      **Eight** of the nine factors used to determine "bad faith intent to profit" support a

19  conclusion that Saadat-Nejad violated the ACPA.  Having shown success on the merits, a

20  permanent injunction should issue.

21  **A Permanent Injunction Will Not Infringe On Saadat-Nejad's First Amendment Rights.**

22      A permanent injunction will only prevent Saadat-Nejad from disparaging Solomon

23  Ward on web sites that contain "Solomon Ward" in their domain name.  It will have no

24  effect on any other web sites he registers for purposes of attacking Solomon Ward or anyone

25  else.  At the June 12, 2008 hearing Saadat-Nejad admitted that he had **forty** such web sites

26  up and running as of then.[46]  A June 27, 2008 Google search revealed **eight** different web

27  _____

28  [46]  Transcript of June 12, 2008 hearing, p. 24 - Exhibit 9 to Notice of Lodgment.

sites with various disparaging remarks about Solomon Ward or Pacific Law Center.[47] The permanent injunction—in the form of the existing preliminary injunction— will not affect those web sites, nor will it prejudice Saadat-Nejad in any way. Thus, Saadat-Nejad has ample opportunity to criticize Solomon Ward; the ACPA, however, bars him from misappropriating Solomon Ward's own trade name, service mark or registered domain name to do it.

Even when the ACLU intervened in this case on Saadat-Nejad's behalf, it did not do so because of any potential First Amendment violations or issues related to the ACPA. Rather, the ACLU's sole contention was that the Court should ensure that Saadat-Nejad had counsel for the civil contempt proceeding or at least validly waived his right to counsel.[48]

During the June 12, 2008 hearing before this Court, Saadat-Nejad accused Solomon Ward of shutting down some of his sites, including ushostage.com. Solomon Ward did no such thing. Solomon Ward filed a complaint with ICANN (Internet Corporation for Assigned Names and Numbers), asking that it shut down the two web sites containing "Solomon Ward" in the domain names, as Judge Burns ordered.[49] Go Daddy Software Inc. ("Go Daddy") is the registrar of these two web sites as well as some of the other web sites that Saadat-Nejad had registered, including ushostage.com. To the extent Go Daddy shut down any of Saadat-Nejad's web sites (other than the two Solomon Ward requested), Saadat-Nejad should take that matter up with Go Daddy.

## VI
## JUDGE BURNS' FINDINGS SHOULD STAND

"Generally, one judge should not overrule the prior decision of another judge sitting in the same case because of the principles of comity and uniformity which preserve the

---

[47] Vasseghi Decl. ¶ 5.; *See* Exhibits 1 through 8 to Notice of Lodgment.
[48] Brief of Amicus Curiae ACLU of San Diego & Imperial Counties 2:1-3 (Docket No.46).
[49] McIntyre Decl. ¶ 3 and Exhibits.

1   orderly functioning of the judicial process."[50]  In the Ninth Circuit, a judge should only

2   overrule a prior judge's decision for the "most cogent reasons" or when "exceptional

3   circumstances exist."[51]

4         Judge Burns' findings of fact and law in this case should not be disturbed, including

5   findings of the existence of "both probable success on the merits and the possibility of

6   irreparable harm and that serious questions are raised and the balance of hardships tips

7   sharply in the moving party's favor."  Judge Burns also found that "Saadat-Nejad

8   intentionally obtained and used confusing web sites to discredit and disparage the two law

9   firms."  No "exceptional circumstance" exists for this Court to set aside or exclude these

10  findings that Judge Burns' has already made in this case.  Accordingly, the existing

11  preliminary injunction should be made permanent and this case should end.

12                                    **VII**
                                  **CONCLUSION**

13

14        Saadat-Nejad has no right to misappropriate Solomon Ward's service marks, its trade

15  names and its domain names.  Based on the previous findings of this Court, the evidence

16  already of record, and arguments establishing that it has actually succeeded on the merits,

17  Solomon Ward is entitled to a permanent injunction in the same form as this Court's

18  preliminary injunction.

19  DATED: July 25, 2008                    Respectfully submitted,

20                                          SOLOMON WARD SEIDENWURM & SMITH, LLP

21

22                              By:   _/s/ Edward J. McIntyre_____
                                      EDWARD J. MCINTYRE
23                                    MICHAEL M. VASSEGHI
                                      Attorneys for Solomon Ward Seidenwurm &
24                                    Smith, LLP

25

26  [50]  *In re: Genesisintermedia, Inc. Securities Lit.*, 2007 U.S. Dist. LEXIS 95243, *10 (C.D. Cal. 2007) citing to *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 530 (9th Cir. 2000).

27  [51]  In re *Genesisintermedia, Inc. Securities Lit. supra* at *11, citing to *Castner v. First National Bank of Anchorage*, 278 F.2d 376, 379-380 (9th Cir. 1960).

28

## CERTIFICATE OF SERVICE

I caused the **SOLOMON WARD'S BRIEF ADDRESSING ISSUES THIS COURT'S ORDER RAISED DIRECTING PARTIES TO SHOW CAUSE WHY SUMMARY JUDGMENT SHOULD NOT BE ENTERED** to be served in the following manner:

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

### Electronic Mail Notice List

Robert F. Clarke, Esq. (SBN 79881)
Phillips & Associates
3030 N. Third Street, Suite 1100
Phoenix, AZ 85012
Telephone:  (602) 258-8900
Facsimile:   (602) 288-1671
Attorneys for Pacific Law Center

The following party is not on the list to receive e-mail notices from the Court.  We are emailing copies to Mr. Saadat-Nejad at c9729972@yahoo.com.

In addition, we are sending hard copies via Federal Express:

Shahrokh Saadat-Nejad
3713 Mt. Ashmun Place
San Diego, CA 92111
**VIA FEDERAL EXPRESS**

/s/ Edward J. McIntyre
EDWARD J. MCINTYRE